IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Maritza Dominguez Braswell**

Civil Action No. 23–cv–00883–MDB

DEBRA SCHMIDT, and
KELLY KOHLS,

    Plaintiffs,

v.

FALCON SCHOOL DISTRICT 49,
JOHN GRAHAM, individually and in his official capacity as president of the Board of Education of Falcon School District 49,
ROBERT KONZ, and
DAVID GLENN,

    Defendants.

# ORDER

This matter is before the Court on Plaintiffs' Motion for Summary Judgment. (["Motion"], Doc. No. 28.) Defendants filed a response (["Response"], Doc. No. 32) and Plaintiffs have replied (["Reply"], Doc. No. 35). After reviewing the Motion, briefing and relevant law the Motion is **DENIED**.

## STATEMENT OF THE CASE

### I.    Undisputed Material Facts

Plaintiffs bring this First Amendment suit under 42 U.S.C. § 1983 in connection with their expressive activity at a February 22, 2023, School District 49 ("District 49" or the

"District") Board of Education (the "Board") meeting. (*See generally* Doc. No. 1.) The following facts are undisputed unless otherwise noted.

On November 10, 2022, the Board conducted a special meeting to consider a proposed resolution concerning an outspoken member of the Board, Ivy Liu. (Doc. No. 35-2 at ¶ 1; Doc. No. 28-1 at ¶ 7.) During that meeting, certain attendees held signs calling on Ms. Liu to resign. (Doc. No. 35-2 at ¶ 3; Doc. No. 28-1 at ¶ 8.) Others in attendance displayed signs that had "thumbs up" or "thumbs down" symbols displayed. (Doc. No. 35-2 at ¶ 6; Doc. No. 28-1 at ¶14.)

Apparently, the chaotic nature of the November 10, 2022, special meeting prompted the Borad to "reevaluat[e] standards of appropriate decorum at Board meetings." (Doc. No. 32 at 14 (citing Doc. No. 32-2[1] at 33:15–37:24).) This re-evaluation led to what the Court will refer to as District 49's "Sign Policy." (Doc. No. 1 at ¶¶ 49–57.) The Sign Policy prohibits District 49 meeting attendees from holding signs with specific written language on them—such as text calling for a Board member to resign. (Doc. No. 35-2 at ¶ 10.) The Sign Policy allows for other expressive conduct, including thumbs up/thumbs down signs, jazz hands, and standing.[2] (*Id.* at

---

[1] This document is the deposition of District 49 Superintendent and 30(b)(6) deponent, Peter Hilts. In their Reply, Plaintiffs contend Defendants "failed to properly prepare Mr. Hilts to provide testimony as a corporate designee" and "Mr. Hilts undertook no effort to prepare to testify as the corporate designee" and "conducted no investigation and engaged in no effort to ascertain the knowledge of the School District with respect to the designated topics." (Doc. No. 35 at n. 2.) But this argument, raised in a single footnote, is too general to hold any weight. Moreover, the fact that Plaintiffs appear to have raised this issue for the first time in their summary judgment Reply—filed nearly four months after the 30(b)(6) deposition (*compare* Doc. No. 32-2, *with* Doc. No. 35)—rather than in the Motion itself or, most appropriately, through the Court's discovery dispute procedures, leads the Court to the conclusion that the argument has been waived.

[2] A statement read at the beginning of District 49 meetings apparently includes an instruction that signs with written messages are not allowed. (Doc. No. 32 at 14 (citing 32-2 at 37:17–24).)

¶¶ 11–16; *see* Doc. No. 35-2 at ¶¶ 9, 11, 13, 14, 16; Doc. No. 28-3 at 11:9–13, 14:25–15:1, 78:16–18; 82:15–19; 86:8–10.) Defendants say they began enforcing this policy during the November 10, 2022, *regular* meeting which immediately followed the same-day *special* meeting regarding Ms. Liu. (*Id.* at 15 (citing Doc. No. 32-1 at 22:25–23:7; Doc. No. 32-7).)

The Board conducted another meeting on February 22, 2023. (Doc. No. 35-2 at ¶ 8; Doc. No. 28-1 at ¶ 17.) For at least some portion of the meeting, Plaintiffs, sitting in the front row, held 8½ x 11" letter-sized signs at chest level.[3] (Doc. No. 35-2 at ¶¶ 19, 20, 21, 23.) These signs called for the resignation of Defendant Graham, as well as fellow Board members, Lori Thompson and Rick Van Wieren. (Doc. No. 1 at ¶¶ 33–34.) Nearly 2 hours and 45 minutes into the February 22, 2023, meeting, a disagreement arose between Ms. Liu and Defendant Graham. (Doc. No. 35-2 at ¶ 26; Doc. No. 28-3, Ex. 3 at 2:48:41–2:50:07.) Nearly 2 hours and 50 minutes into the meeting, Defendant Graham halted the meeting and demanded that Plaintiffs not display their signs. (Doc. No. 35-2 at ¶ 27; Doc. No. 28-1 at ¶ 23; Doc. No. 28-2 at ¶ 10; *see* Doc. No. 35-2 at ¶ 28; Doc. No. 28-3, Ex. 3 at 2:50:48–2:51:36.) Approximately a minute later, Defendant Graham again paused the meeting and declared the Board was going into recess to address Plaintiffs' signs. (Doc. No. 35-2 at ¶ 29; Doc. No. 28-1 at ¶ 27; Doc. No. 28-2 at ¶ 13.)

---

[3] The parties dispute how long the signs were held and how visible the signs were to the Board members. Plaintiffs say the signs were "readily visible" to the Board and were held "[t]hroughout the course of the meeting." (Doc. No. 35-2 at ¶¶ 19–20, 22.) Defendants say Defendant Graham only saw the signs "for a matter of minutes" and "did not observe Plaintiffs holding signs 'throughout the meeting.'" (*Id.* at ¶¶ 19–20, 22.)

Shortly thereafter, Defendant Glenn, a safety and security specialist employed by District 49, told Plaintiffs their signs were disruptive to the meeting and that they needed to leave.[4] (Doc. No. 35-2 at ¶¶ 31–33; Doc. No. 28-5, Ex. 7 at 1:19–24.) Defendant Glenn was assisted by Defendant Konz, another safety and security specialist employed by District 49. (Doc. No. 35-2 at ¶¶ 31–33; Doc. No. 28–4 at 6:21–25; 22:18–19.) Defendants Glenn and Konz then escorted Plaintiffs from the meeting and did not allow them to use the restroom before leaving the building. (Doc. No. 35-2 at ¶ 38; Doc. No. 28-1 at ¶ 28–30; Doc. No. 28-2 at ¶¶ 14–16; Doc. No. 28-4 at 31:22–32:4.)

**II.     Motion for Summary Judgment**

In their Motion, Plaintiffs argue that, for the purpose of a First Amendment analysis, the Board's meetings are designated public forums, and thus, any content-based regulation of speech must satisfy strict scrutiny, and any viewpoint-based restriction is prohibited. (Doc. No. 28 at 9–12.) Plaintiffs argue the Board's decision to bar them from holding their signs, and then remove them from the February 22, 2023, meeting failed to satisfy the strict scrutiny test and thus constituted a First Amendment violation. (*Id.* at 12–16.) Alternatively, Plaintiffs argue that even if the Board's meetings are the least protected type of forum, nonpublic forums, their First Amendment rights were still violated because the restriction is unreasonable. (*Id.* at 16–20.)[5]

---

[4] Defendant Glenn testified that he did not personally observe any disruption in the proceedings or have concern about the safety of any meeting participant. (Doc. No. 35-2 at ¶¶ 34–35; Doc. No. 28-5 at 20:25–21:8, 23:17–20, 25:8–26:20; 32:6–8.) Similarly, Defendant Konz said he was not "in a position to say" what had disrupted the proceedings. (Doc. No. 28-4 at 30:5–12.)

[5] Plaintiffs further contend the Board's actions violated their Equal Protection and Due Process rights under the Fourteenth Amendment. (*Id.* at 20–23.) Plaintiffs' Complaint references the Fourteenth Amendment, but does not assert any specific Fourteenth Amendment claims. (*See* Doc. No. 1.) In response, Defendants argue these "claims" are essentially subsumed by the

Plaintiffs seek damages as well as declaratory and injunctive relief against the Board. (*Id.* at 23–25.)

In response, Defendants argue school board meetings "are now near universally recognized amongst federal courts as limited public forums," subject to reasonable and viewpoint-neutral speech restrictions. (Doc. No. 32 at 7–12.) Defendants then argue the prohibition on Plaintiffs' signs was viewpoint-neutral and reasonable and that Plaintiffs present a distorted picture of the factual record. (*Id*. at 13–18.)

## LEGAL STANDARD

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex*, 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but instead, must designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c).

"A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v.*

---

Court's First Amendment analysis and are not appropriate for summary adjudication due to factual disputes on the First Amendment claim. (Doc. No. 32 at 17–19.) Plaintiffs' reply does not address Defendants' arguments or otherwise reference these "claims." (*See* Doc. No. 35.) Accordingly, the Court presumes Plaintiffs have abandoned these arguments.

*Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986)). Whether there is a genuine dispute as to a material fact depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury," or conversely, whether the evidence "is so one-sided that one party must prevail as a matter of law." *Carey v. U.S. Postal Serv.*, 812 F.2d 621, 623 (quoting *Anderson*, 477 U.S. at 251-52). A disputed fact is "material" if "under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (citing *Anderson*, 477 U.S. at 248). "Where the record taken as a whole could not lead a rational trier of fact to find for the [nonmovant], there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

In evaluating a motion for summary judgment, a court may consider admissible evidence only. *Johnson v. Weld Cnty.*, 594 F.3d 1202, 1209–10 (10th Cir. 2010). The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Concrete Works*, 36 F.3d at 1517. However, this standard does not require the Court to make unreasonable inferences in favor of the nonmoving party. *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1276 (10th Cir. 2008). The nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case. *Hulsey v. Kmart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994).

## ANALYSIS

The First Amendment prohibits any law "abridging the freedom of speech." U.S. Const. amend. I. The First Amendment applies to state and local governments through the Fourteenth Amendment's Due Process Clause. *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 35 (10th Cir. 2013); *Hawkins v. City & Cnty. of Denver*, 170 F.3d 1281, 1286 (10th Cir. 1999).

A plaintiff may bring two types of First Amendment challenges to government policy: facial and as-applied. *Colo. Right to Life Comm. v. Coffman*, 498 F.3d 1137, 1146 (10th Cir. 2007). "A facial challenge considers the restriction's application to all conceivable parties, while an as-applied challenge tests the application of that restriction to the facts of a plaintiff's concrete case." *Id.*; *see Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 426 (5th Cir. 2014) (noting that "the precise boundaries of facial and as-applied challenges are somewhat elusive—certain challenges can have characteristics of both").

Here, the exact nature of Plaintiffs' challenge is not entirely clear. Plaintiffs bring a single First Amendment claim, arguing that Defendants violated their freedom of speech during the February 22, 2023, special meeting. But neither the Complaint nor the parties' briefing specifically describes the challenge as either a facial challenge or an as-applied challenge. (Doc. Nos. 28; 32; 35.) On the one hand, the Complaint suggests an as-applied challenge by contending the Sign Policy "stifled and censored" Plaintiffs' personal "core political speech." (Doc. No. 1 at ¶ 52.) Moreover, the primary focus of the Motion is the specific "prohibition against Ms. SCHMIDT and Ms. KOHLS displaying their ... signs." (*See, e.g.*, Doc. No. 28 at 11–16.) Plaintiffs also seek damages, further suggesting an as-applied challenge. (Doc. No. 1 at ¶ 57); *see Hunt v. City of Los Angeles*, 638 F.3d 703, 710 (9th Cir. 2011) ("A plaintiff may ... seek damages by raising an as-applied challenge, asserting 'that the law is unconstitutional as applied to his

7

own speech or expressive conduct.'" (quoting *Santa Monica Food Not Bombs v. City of Santa Monica,* 450 F.3d 1022, 1034 (9th Cir. 2006)); *Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 803 (7th Cir. 2016) ("[A] facial challenge usually invites prospective relief, such as an injunction, whereas an as-applied challenge invites narrower, retrospective relief, such as damages.").

On the other hand, certain aspects of the suit point to a facial challenge. For example, the Complaint asserts the Sign Policy generally "violate[s] the First Amendment rights of those who attend meetings of the Board ... by prohibiting and forcing the removal of individuals who hold signs during the course of such meetings and who do so in a manner that is not disruptive or interfering with the meeting itself or those in attendance." (Doc. No. 1 at ¶ 56.) Likewise, Plaintiffs argue in their Motion that the Sign Policy lacks "objective criteria" for its enforcement and allows certain admittedly disruptive behaviors while arbitrarily barring others. (Doc. No. 28 at 17–20.) Moreover, certain relief sought by Plaintiffs, including a declaration that the "policies, practices, and customs" of District 49 violated the First Amendment, and a preliminary injunction against Defendant Graham's enforcement of the Sign Policy against Plaintiffs and "and others similarly situated," suggests a facial challenge. (Doc. No. 1 at ¶ 57); *see John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (noting that if the relief sought "reach[es] beyond the particular circumstances of these plaintiffs" a facial challenge is presented); *Six Star Holdings*, 821 F.3d at 803.

Accordingly, the Court will review the claim as both a facial and an as-applied challenge to the Sign Policy.

**I.     Facial Challenge**

In determining whether the Sign Policy is an appropriate restriction of public expression, the Court engages in a three-step analysis. First, it must determine whether Plaintiffs' conduct is protected speech, second, it must "identify the nature of the forum, because the extent to which the [defendant] may limit access depends on whether the forum is public or nonpublic," and third, it must determine "whether the justifications for exclusion from the relevant forum satisfy the requisite standard." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985); *see Verlo v. Martinez*, 820 F.3d 1113, 1128 (10th Cir. 2016).

There is no dispute as to the first step and thus the Court moves on to steps two and three. (*See* Doc. No. 28 at 8–9; Doc. No. 32 at n.1 ("Defendants agree that Plaintiffs' speech or expression on the evening of February 22, 2023, was protected speech under the First Amendment.").); *see also City of Madison, Joint Sch. Dist. No. 8 v. Wis. Emp. Rels. Comm'n*, 429 U.S. 167, 174–75, (1976) (holding that the First Amendment protects the rights of speakers at school board meetings that were opened for direct citizen involvement and permitted public participation); *see, e.g.*, *Gilmore v. Beveridge*, 2022 WL 3139023, at *5 (D. Kan. Aug. 5, 2022) ("[T]here is no meaningful dispute that Plaintiff's statements to the school board are protected speech."); *Miller v. Goggin*, 672 F. Supp. 3d 14, 46 (E.D. Pa. 2023) ("Plaintiff's criticism of the school board ... is undoubtedly protected by the First Amendment."); *see also City of Ladue v. Gilleo*, 512 U.S. 43, 48 (1994) ("[S]igns are a form of expression protected by the Free Speech Clause.").

### A. Are District 49 Meetings a Designated Public Forum or a Limited Public Forum?

"The government's ability to regulate protected speech on government or public property turns on the character of the space in which it seeks to implement such regulation." *Browne v.*

*City of Grand Junction, Colorado*, 27 F. Supp. 3d 1161, 1166 (D. Colo. 2014) (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45 (1983)). Traditionally, courts have recognized "three types of fora: the traditional public forum, the public forum created by government designation ["designated forums"], and the nonpublic forum." *Cornelius*, 473 U.S. 788, at 802 (1985). However, courts have increasingly recognized a fourth type—the limited public forum. *See* 16A Am. Jur. 2d Constitutional Law § 542. The government's ability to regulate speech in a limited public forum falls closer to the nonpublic forum than the designated public forum, because limited public forums are specifically "created for certain groups or for the discussion of certain topics," *Moms for Liberty - Brevard Cnty., FL v. Brevard Pub. Sch.*, 118 F.4th 1324, 1331 (11th Cir. 2024), whereas designated public forums are "generally available to a class of speakers." 16A Am. Jur. 2d Constitutional Law § 541; *see Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1224 (11th Cir. 2017) ("[A] designated public forum grants 'general access' to the designated class, while a limited public forum can be set up to grant only 'selective access' to that class.*"*). Broadly speaking, "the Constitution imposes more severe restrictions on government regulation of private speech in a traditional public forum or a designated public forum than in a limited public forum or a non-public forum." *Child Evangelism Fellowship of MD, Inc. v. Montgomery Cnty. Pub. Sch.*, 457 F.3d 376, 383 (4th Cir. 2006).

In their Motion, Plaintiffs argue District 49 meetings are designated public forums rather than limited public forums and therefore, any regulation on speech triggers strict scrutiny. (Doc. No. 28 at 9–11.) In making their argument, Plaintiffs rely heavily on one line in *Hawkins v. City and County of Denver*. 170 F.3d 1281, 1287 (10th Cir. 1999) (holding that Denver law banning leafleting and picketing in a covered pedestrian walkway in a performing arts complex did not

violate the First Amendment). There, the court briefly noted that "school board meetings open to the public by state statute" are an example of a designated forum. *Id.* (citing *City of Madison, Jt. Sch. Dist. No.,* 429 U.S. at 174–75). But, as Defendants argue, Plaintiffs' reliance on *Hawkins* is misplaced.

First, *Hawkins* is factually distinct in meaningful ways. Second, the limited public forum was not yet a recognized concept when *Hawkins* was decided. *See id.* at 1286 ("The Supreme Court has identified three distinct categories of government property: (1) traditional public fora; (2) designated public fora; and (3) nonpublic fora."); *see also Doe v. City of Albuquerque*, 667 F.3d 1111, 1130 (10th Cir. 2012) ((observing that "the Supreme Court has only recently clarified the terminology of 'designated' and 'limited' public fora" (citing *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of Law v. Martinez,* 561 U.S. 661 (2010)); *Pleasant Grove City v. Summum*, 555 U.S. 460, (2009))). And third, the Tenth Circuit has expressly described the forum examples in *Hawkins*, as dicta. *See Doe*, 667 F.3d at 1128 (saying the *Hawkins* "pronouncement" that public libraries are designated public forums was "dicta").

Neither the Tenth Circuit nor any court in this District has expressly determined whether school board meetings are designated public forums or limited public forums.[6] But the Tenth

---

[6] Some decisions have come close. For example, in *Pollak v. Wilson*, Tenth Circuit analyzed a school board's meeting policy within the context of the limited public forum. 2022 WL 17958787, at *7–9 (10th Cir. Dec. 27, 2022) (unpublished). But there, the parties *agreed* the meetings were limited public forums. *Id.* Additionally, this Court recently analyzed an as-applied challenge in the context of a school district board meeting. *See* Case No. 1:24-cv-02490-MDB, Doc. No. 47. But on the threshold issue of qualified immunity—and whether it was clearly established that enforcement of a certain policy constituted viewpoint discrimination—the Court was not required to resolve the limited or designated public forum issue, because under either framework, viewpoint discrimination is forbidden. *See Shero v. City of Grove, Okl.*, 510 F.3d 1196, 1202 (10th Cir. 2007) ("Any government restriction on speech in a limited public forum must ... be viewpoint neutral."); *People for the Ethical Treatment of Animals v. Tabak*, 109 F.4th

Circuit provides a framework for making that determination.[7] It instructs that limited public forums "arise[ ] where the government allows selective access to some speakers or some types of speech in a nonpublic forum, but does not open the property sufficiently to become a designated public forum." *Shero v. City of Grove, Okl.*, 510 F.3d 1196, 1202 (10th Cir. 2007) (quoting *Summum v. City of Ogden,* 297 F.3d 995, 1002 n. 4 (10th Cir. 2002)). In other words, a limited public forum is a forum "reserved for its intended purpose." *Gilmore*, 2022 WL 3139023, at *6 (citing *Cole v. Goossen*, 402 F. Supp. 3d 992, 1015 (D. Kan. 2019)).

Courts consider three "non-exhaustive factors" for determining "whether the government has created a designated public forum instead of a limited public forum." *Celebrity Attractions, Inc. v. Oklahoma City Pub. Prop. Auth.*, 660 F. App'x 600, 605 (10th Cir. 2016) (quoting *Doe*, 667 F.3d at 1129). First, the forum's purpose, second, the extent of the forum's use, and third, the government's intent in opening the forum to the public. *Celebrity Attractions, Inc. v. Oklahoma City Pub. Prop. Auth.*, 660 F. App'x 600, 605 (10th Cir. 2016) (quoting *Doe*, 667 F.3d at 1129).

In *Doe*, the court found a city's public libraries constitute designated public forums. *Doe*, 667 F.3d at 1128–30. In coming to this conclusion, the Court emphasized that libraries are open

---

627, 632 (D.C. Cir. 2024) (noting that designated public forums are subject to the same standard as public forums, and that in public forums "restrictions ... based on viewpoint are prohibited" (quoting *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018)).

[7] Additionally, the Tenth Circuit has expressly stated "that a 'designated public forum' and a 'limited public forum' are distinct categories and subject to different standards in evaluating governmental restrictions on speech in these fora." *Doe*, 667 F.3d at 1128 (citing *Martinez,* 561 U.S. 661 (2010)). Thus, the Court rejects any suggestion by Plaintiffs that a limited public forum is not a distinct forum type in First Amendment jurisprudence. *See id.*

"to the public to engage in myriad ways to receive information," allow "general access to the public, without any need for pre-approval" and are intended to "provide a forum for all of the City's residents to engage in the receipt of information." *Id.* at 1129–30.

At the outset, the Court acknowledges that—like a city's public libraries—District 49 meetings are generally open to members of the public and anyone is free to attend without pre-approval. *See Doe*, 667 F.3d at 1129–30. *Cf. Celebrity Attractions*, 660 F. App'x at 605 (finding the requirement of permits—with specific considerations for granting such permits—suggested a limited public forum). Additionally, meeting attendees are permitted to engage in broad expressive activity while observing the proceedings. Thus, the first factor appears to weigh in favor of a designated public forum.

However, the remaining two factors decidedly weigh in favor of a limited public forum. Unlike a public library, the purpose of District 49's meetings is to discuss and conduct the specific business of District 49. Attendees are not allowed to engage with the meetings in any matter and on any topic they see fit. Instead, they must limit their comment time and adhere to relevant topics. (*See, e.g.*, Doc. No. 32 at 12 (noting that public comment during District 49 meetings is limited to two minutes per person and must "deal with topics related to the Board's conduct of the schools").) "That purpose indicates a selective design as to the speakers and types of speech allowed at the [meeting]," suggesting a limited public forum. *Celebrity Attractions*, 660 F. App'x at 605. Moreover, the government's apparent intent in opening the forum, for the limited purpose of allowing public observation of, and limited participation in, District 49's

13

decision-making, also points to a limited public forum.[8] *See Celebrity Attractions, Inc.*, 660 F. App'x at 605 (finding that being open "solely to the discussion of certain subjects," is the hallmark of a limited public forum).

In short, the Court concludes that the District 49 meetings at issue here are limited public forums. This conclusion is consistent with decisions around the country finding school board meetings constitute limited public forums. *See*, *e.g.*, *McBreairty v. Sch. Bd. of RSU 22*, 616 F. Supp. 3d 79, 92 (D. Me. 2022) ("[M]ost courts that have considered the issue have found that [school board meetings] fall in the limited public forum category"); *Moms for Liberty.*, 118 F.4th at 1331 ("[T]he school board meetings here qualify as limited public forums."); *Barna v. Bd. of Sch. Directors of Panther Valley Sch. Dist.*, 877 F.3d 136, 142 (3d Cir. 2017) (describing a school board meeting as "a limited public forum"); *Green v. Nocciero*, 676 F.3d 748, 753 (8th Cir. 2012) ("For First Amendment purposes, the School Board meeting was what has variously been called a nonpublic or a limited public forum.").

Plaintiffs appear to pivot in their Reply, arguing Defendants' focus on "a meeting of a generic board of education" ignores the specifics of a District 49 meeting. According to

---

[8] Though the Tenth Circuit's test theoretically involves separate consideration of the forum's *purpose* and of the government's *intent* in opening the forum, the natural similarity of these two inquiries tends to cause them to be satisfied by the same or similar facts. *See Doe*, 667 F.3d at 1128–30 (saying the purpose of a public library is to allow the "public to engage in myriad ways to receive information" and that the government intent in opening a library is to "provide a forum for all of the City's residents to engage in the receipt of information"); *Celebrity Attractions*, 660 F. App'x at 605 (saying the purpose of a city music hall was "to serve as a venue for large scale productions of art forms like ballets, symphonies and Broadway shows" and the government intent in opening the theater was to "to bring year-round, world class entertainment, by offering the best of ballet, theatre, Broadway, chorus, and orchestra and to develop a revenue stream needed to maintain, operate and upgrade the [venue].").

Plaintiffs, because attendees of District 49 meetings "could engage in various expressive activities *throughout the course of the entire meetings*" rather than solely during the public comment portion of the meeting, (Doc. No. 35 at 4 (emphasis in original)), the Board has "expanded the scope" of its meetings beyond "the business of the school district," and thus the meetings are designated public forums. (*Id.* at 5.) But Plaintiffs do not point to—and the Court has not found—any case suggesting that by allowing attendees to express themselves from their seats while observing school board meetings, the District constrains its ability to regulate speech. Indeed, such a rule strikes the Court as illogical. Under that formulation, the District would be motivated to further restrict speech they may not otherwise care to restrict.

### B. Is the Sign Policy Reasonable and Viewpoint Neutral?

In a limited public forum, the government can put *reasonable limits on content* based on the nature of the forum, so long as the distinctions are *viewpoint neutral*. *Gilmore*, 2022 WL 3139023, at *6 (emphasis in original) (citing *Summum v. Callaghan*, 130 F.3d 906, 916 (10th Cir. 1997)); *see Shero*, 510 F.3d at 1202 ("Any government restriction on speech in a limited public forum must only be reasonable in light of the purpose served by the forum and be viewpoint neutral."). Plaintiffs do not appear to challenge the Sign Policy on the basis of viewpoint discrimination; thus, the only remaining question is whether the Sign Policy places reasonable limitations on content. (*See generally* Doc. No. 28.)

There appears to be no written version of the Sign Policy, and the parties have not provided a copy of the message read at the beginning of District 49 meetings, which apparently conveys—among other things—the Sign Policy. However, the parties appear to agree that the Sign Policy bars District 49 meeting attendees from holding signs that display *written* messages,

15

even though it does not bar other expressive activities, such as standing or using jazz hands, or holding signs with a thumbs up or down symbol. (Doc. No. 35-2 at ¶¶ 10–16.) Thus, the Court is tasked with determining whether a "no-written-messages" restriction is reasonable as a matter of law.

"[T]he reasonableness of a particular regulation is determined by a fact-intensive balancing test that takes into account such factors as the uses to which the forum typically is put, the particular risks associated with the speech activity at issue, and the proffered rationale for the restriction." *New England Reg'l Council of Carpenters v. Kinton*, 284 F.3d 9, 20 (1st Cir. 2002) (citing *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee (ISKCON),* 505 U.S. 672 (1992)). However, "[f]or a court to uphold a speech restriction as reasonable, 'it need not be the most reasonable or the only reasonable limitation.'" *Hawkins*, 170 F.3d at 1287 (quoting *International Soc'y for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 683 (1992). Defendants have the burden of demonstrating reasonableness. *See United States v. Playboy Ent. Grp., Inc*., 529 U.S. 803, 812 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions.").

Here, the reasonableness of the restriction turns on certain disputed facts. Most significantly, Defendants say the no-written-messages restriction is justified because written messages are more disruptive than other forms of expression. (Doc. No. 32-2 at 30:12–32:5; *see* Doc. No. 32 at 17 ("[G]eneral expressions of agreement or disagreement with a speaker have not been found to be disruptive in the same way as displaying specific written messages directed at Board members."). Plaintiffs on the other hand, contend the distinction is illogical and lacks a

16

sensible basis.[9] In other words, there is a genuine dispute over the reasonableness of the restrictions. Resolving that dispute will require evidence and witness testimony concerning the November 2022 special meeting and the particular risks that came to light as a result of that meeting. This is turn will require credibility determinations and weighing of evidence that is reserved for a factfinder. *See Tolan*, 572 U.S. at 656. Accordingly, Plaintiffs' Motion is denied as to their facial challenge.

## II.    As-Applied Challenge

Next, the Court turns to whether the Sign Policy has been applied to Plaintiffs in an unconstitutional manner. Plaintiffs contend the Board enforced the policy against them solely because of their political viewpoint and that unlike Plaintiffs, the attendees who previously held signs calling for Ms. Lui's resignation, were not required to put down their signs.

Defendants argue Plaintiffs' version of the factual record is distorted and misleading. (Doc. No. 28 at 13–16.) Specifically, Defendants contend the Sign Policy was created *in response to* the special meeting concerning Ms. Liu, and therefore could not have been enforced against the other sign-holders *during* the special meeting. Defendants also present evidence that

---

[9] Plaintiffs also argue the Sign Policy was not developed using "any objective factors ... when coming to the conclusion that the practice would only allow thumbs up or thumbs down sign." (Doc. No. 28 at 17, 19.) This argument fails. The Supreme Court's use of the phrase "objective, workable standards" in First Amendment cases does not refer to the method in which a restriction was *developed*, but rather the manner in which the restriction is *applied*. *See Mansky*, 585 U.S. at 21 (saying that election judges implementing a ban on clothing with political messaging at polling places "must be guided by objective, workable standards"). Moreover, to the extent Plaintiffs also argue the Sign Policy is not *applied* using objective, workable standards (*see* Doc. No. 28 at 20), the Court rejects that argument as well. The Policy is objective and workable: signs with written messaging are not allowed. The Policy draws a clear line and allows its enforcer to make simple, objective decisions.

the Sign Policy was indeed enforced on those seeking Ms. Liu's resignation during the regular meeting immediately following the special meeting. (Doc. No. 32-1 at 22:25–23:7.) Moreover, Defendants offer evidence that the policy was consistently enforced and that Plaintiffs were not singled out. (Doc. No. 32 at 16 (citing Doc. No. 32-2 at 31:24–32:5 ("[I]t was our practice that written signs were disallowed and every time, which is only two instances, every time that a written sign was put up, the board president consistently said put that down. The difference is in these two cases in November, they immediately put them down, and in February they denied, or declined, to put them down.").) The parties' genuine dispute over material facts precludes summary judgment.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment. (Doc. No. 28) is **DENIED**. Trial and pre-trial hearing dates will be set by separate order.

Dated this 21st day of March, 2025.

**BY THE COURT:**

_____
Maritza Dominguez Braswell
United States Magistrate Judge